**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
_____

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **LACEY GRAVES** | : | **NO. 06-95** |
| | : | |

_____

**DuBois, J.**                                                                                   **June 27, 2013**

<u>**M E M O R A N D U M**</u>

**I.        INTRODUCTION**

After two mistrials, Lacey Graves was convicted of armed bank robbery in violation of 18 U.S.C. § 2113(d).  Presently before the Court is Graves's Motion under 28 U.S.C. § 2255. The motion presents two issues: First, whether trial counsel was ineffective for failing to move to suppress evidence obtained pursuant to facially invalid search warrants – the search warrants did not identify or incorporate by reference the items to be seized.  Second, whether trial counsel was ineffective for failing to call Leslie Neal – a government witness at Graves's first and second trials – as a defense witness at Graves's third trial.

Because the record did not conclusively show that Graves was not entitled to relief, the Court held an evidentiary hearing on April 5, 2012.  Following the hearing, the Court ordered additional briefing addressing the decisions in <u>Groh v. Ramirez</u>, 540 U.S. 551 (2004) and <u>Doe v. Groody</u>, 361 F.3d 232 (3d Cir. 2004).  These cases involve search warrants that did not incorporate descriptions of either the items to be seized (in <u>Groh</u>) or the persons to be searched (in <u>Groody</u>) that were contained in a separate document.  For the reasons set forth below, Graves's § 2255 motion is denied.

## II.    BACKGROUND[1]

After two mistrials, Graves was convicted in November 2007 of armed bank robbery in violation of 18 U.S.C. § 2113(d).  According to the government's theory of the case at trial, Graves, with a mask and sunglasses covering his face, entered a Univest Bank, displayed a handgun, vaulted over the teller counter, and stole $6,421 in cash.  Eyewitnesses and physical evidence linked Graves to the crime:

### A.    The Eyewitnesses

Several bank employees who were working on the day of the robbery testified as to what they saw.

#### (a)    Kimberly Krapf and Tara Detweiler Saw a Suspicious Woman and a Red Isuzu Rodeo

Branch manager Kimberly Krapf noticed a suspicious woman standing by the front entrance of the bank with a scarf over her head and face, looking into the glass lobby doors.  (Trial Tr. 11/6/2007, at 38-39.)  The woman later drove away in a red Isuzu Rodeo.  (Id. at 40, 99.)  Before the car left the parking lot, Krapf alerted other employees to the suspicious activity, one of whom, Tara Detweiler, wrote down the license plate number of the Isuzu (although she was off by one letter).  (Id. at 39-40, 101-102; Trial Tr. 11/7/2007, at 34.)  Later investigation by FBI Special Agent Kenneth Vincent revealed that the vehicle was registered to Graves.  (Trial Tr. 11/7/2007, at 32-34.)

---

[1] For further background on the case, see United States v. Graves, 373 Fed. App'x 229 (3d Cir. 2010); United States v. Graves, 2007 WL 2461744 (E.D. Pa. Aug. 22, 2007); United States v. Graves, 2007 WL 2319765 (E.D. Pa. July 13, 2007); United States v. Graves, 465 F. Supp. 2d 450 (E.D. Pa. 2006); United States v. Graves, 2006 WL 1997378 (E.D. Pa. July 12, 2006); and Order dated December 14, 2010 (Document No. 224).

Shortly after the suspicious woman's departure, the bank's assistant manager Kimberly Buckley looked out the window of the bank's break room and saw an African-American man approaching the bank.  (Trial Tr. 11/6/2007, at 158-65.)  She was able to look at him through open window blinds for one to two seconds before he covered his face with his umbrella.  (<u>Id.</u> at 182-83.)  It was dark and raining outside.  (<u>Id.</u> at 183.)  In observing the bank's surveillance monitors, she saw him enter the bank, jump over the teller counter, and take money out of a teller's drawer.  (<u>Id.</u> at 185-87.)

Five days later, Special Agent Vincent showed Buckley a photo array that he had prepared with eight photos: one of Graves and seven "fillers."  (<u>Id.</u> at 195; 11/7/2007, at 45, 49-50.)  All eight photos were presented to Buckley at one time on one sheet of paper.  (Trial Tr. 11/7/2007, at 50; <u>see also</u> Government Trial Exhibit 14.)  Special Agent Vincent told Buckley that the person she saw may not be among the pictures in the array.  (Trial Tr. 11/7/2007, at 50.)  The lighting behind Graves's photo was slightly brighter than the lighting behind the fillers.  (<u>See</u> Government Exhibit 14.)  From this array, Buckley identified Graves as the person she observed from the break room.[2]  (Trial Tr. 11/7/2007, at 170-171.)  She also identified Graves in court.  (<u>Id.</u> at 171.)

The defense called Dr. Soloman Fulero, an expert on eyewitness identifications to counter Buckley's testimony.  He testified that there are three stages of memory: acquisition, retention, and retrieval, or in other words, "[p]utting it in, keeping it, and getting it back out."

_____

[2] Graves moved to suppress this out-of-court identification, which the Court denied by Order dated June 21, 2006 (Document No. 42).

(Id. at 137.)  The defense attacked each of these stages of Buckley's memory through Dr. Fulero's testimony.

With respect to acquisition, Dr. Fulero testified that a dark rainy day could negatively affect a person's ability to accurately remember an event.  (Id. at 143-44.)  He also testified regarding cross-racial identifications.  He stated that people tend to be less accurate at identifying a person of a different race than their own.  (Id. at 140-42.)  For example, a white witness will not be as accurate identifying an African-American as he or she would be identifying another white person.  (Id. at 141-42.)

Regarding retention, Dr. Fulero testified that memory fades rapidly, though not steadily. He stated, "[P]eople are going to forget most of what they're going to forget within the first roughly eight hours or so."  (Id. at 146.)

With respect to retrieval, Dr. Fuerlo discussed the best practices to conduct photo line-ups.  He stated that there were four aspects of presenting a witness a photo array that are important to increase accuracy.  (Id. at 150-51.)  First, the suspect should not stand out from the fillers.  (Id. at 151-57.)  Second, the witness should be instructed that the suspect may not be in the array.  (Id. at 157-59.)  Third, accuracy is increased by showing the witness the photos one at a time ("sequentially") rather than all at once ("simultaneously").  (Id. at 159-61.)  Finally, the presentation should be "double blind."  (Id. at 161-63.)  The person presenting the photo array to the witness should not know who the suspect is so as to not subconsciously communicate the identity of the suspect to the witness.  (Id.)  Defense counsel argued that Buckley's photo identification was undermined based on all but the second factor.  (Trial Tr. 11/8/2007, at 51-52.)

(c)     Tara Detweiler Saw Part of the Robber's Face

Tara Detweiler was the teller at the register that was robbed.  (Trial Tr. 11/6/2007, at 103-104.)  When the robber was behind the counter, she saw through a gap between his sunglasses and mask that he had light skin and freckles or moles on his cheeks.  (Id. at 108.)  This description is consistent with Graves's facial features.

B.      The Physical Evidence and the Warrants

Graves was arrested, and a few days later, Magistrate Judge Jacob B. Hart signed two warrants authorizing searches of Graves's Isuzu Rodeo and the residence of Graves's girlfriend, Leslie Neal.  Each warrant was accompanied by a warrant application and an affidavit sworn by Special Agent Vincent.[3]  The forms of the warrant and warrant application contain spaces for filling out the information required for a valid warrant.  For each search, the sections provided for describing the property to be seized were left blank.  However, "Attachment B" to the affidavit accompanying each warrant contained a list of the items to be seized.

When Graves was arrested, he had between $600 and $700 in cash on his person.  (Trial Tr. 11/7/2007, at 62.)  Recovered from the Isuzu were, inter alia, new tool sets, automotive repair equipment, and numerous receipts for the purchase of goods and services totaling $1,653.90.  (Id. at 66-69.)  Among the items seized from Neal's residence were purchase receipts totaling $226.03 and a pair of men's New Balance sneakers.  (Id. at 69-70.)

When the robber vaulted over the counter, he left shoe impressions.  (Trial Tr. 11/6/2007, at 203.)  Michael Smith, an FBI forensic examiner specializing in shoe print examinations, compared the impressions recovered from the counter to the New Balance sneakers seized from

---

[3] A copy of each "warrant package" shall be docketed by the Deputy Clerk.

Neal's home.  (Id. at 73.)  He could not state conclusively that those New Balance sneakers made the prints on the counter.  (Id. at 70.)  However, he concluded that the impression was consistent with the New Balance sneakers; they could have left the prints.  (Id. at 70, 77.)

C.    Leslie Neal's Testimony

Leslie Neal was called as a government witness at the first two trials but not at the third trial in which Graves was convicted.  During the second trial, Neal testified as follows:  On the day of the robbery, she and Graves drove in his Isuzu Rodeo to a Walmart in Warminster, Pennsylvania located "about five to ten minutes down the road" from the bank.  (Trial Tr. 7/17/2007, at 153, 158-59.)  Graves shopped at the Walmart while Neal drove to the area near the bank to meet an acquaintance of Graves to obtain marijuana.  (Id. at 159-61.)  Unable to find the acquaintance, Neal parked in the bank's parking lot to wait for him.  (Id. at 160-62.)  She then got out of the Isuzu and looked through the bank's glass doors in order to ascertain the time.  (Id. at 162-63.)  Neal also testified that she had purchased the New Balance sneakers after the date of the robbery, and that the day before Graves's arrest, she had given him $400 in cash to be used toward payment for their car insurance policies.  (Id. at 166-68.)  She further testified that on the day of the robbery, she never saw Graves wearing clothing matching the description of the bank robber, she never saw him with a gun, and she never saw him with large sums of money.  (Id. at 165-66.)  Neal testified at the evidentiary hearing on April 5, 2012 that, had she been called in the third trial, her testimony would have been the same.  (Apr. 5, 2012 Hearing Tr. at 20-21.)

III.    LEGAL STANDARD

Graves claims that his trial counsel was ineffective.  "Strickland v. Washington supplies

the standard for addressing a claim of ineffective assistance of counsel." <u>United States v. Smack</u>, 347 F.3d 533, 537 (3d Cir. 2003) (citing <u>Strickland</u>, 466 U.S. 668, 687 (1984)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Strickland</u>, 466 U.S. at 686.

This standard requires a two-part inquiry. "First, the defendant must show that counsel's performance was deficient," that is, "that counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 687-88. The measure for counsel's performance under the first prong of Strickland is "whether counsel's assistance was reasonable considering all the circumstances" including "prevailing professional norms." <u>Id.</u> at 687-88. "Second, the defendant must show that [counsel's] deficient performance prejudiced the defense." <u>Id.</u> at 687.

To establish prejudice, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.

## IV.  DISCUSSION

Graves originally claimed that his two trial attorneys were ineffective for failing to (A) move to suppress certain evidence based on a lack of particularity in the warrant, (B) call Leslie Neal to testify at the third trial, and (C) acquire and authenticate original bank surveillance tapes. However, at the evidentiary hearing, he withdrew his claim based on failing to acquire and authenticate the surveillance tapes after it was demonstrated to counsel that the originals were materially identical to what was shown to the jury.  (Apr. 5, 2012 Hearing Tr. at 15-16.)  The Court will address the remaining two claims in turn.

A.      Failing to Move to Suppress Evidence

Graves argues that counsel was ineffective for failing to move to suppress the evidence found in Neal's home and in Graves's Isuzu on the grounds that the warrants lacked particularity. The Court will address the "performance" and "prejudice" prongs of Strickland in turn.

(a)      Performance

The Court ordered briefing addressing the decisions in Groh v. Ramirez, 540 U.S. 551 (2004) and Doe v. Groody, 361 F.3d 232 (3d Cir. 2004). In Groh, a warrant application particularized the items to be seized in a search, but the warrant itself did identify any item. 540 U.S. at 554. The Supreme Court ruled that the warrant was invalid and the search pursuant to the warrant was unconstitutional. Id. at 558. In Groody, an affidavit accompanying a warrant sought permission to search two people referred to in the decision as Mary and Jane Doe. 361 F.3d at 236. However, the warrant itself did not mention Mary or Jane and did not incorporate the accompanying affidavit. Id. at 236, 239-40. The Third Circuit concluded that the search was conducted outside the scope of the warrant and was therefore unconstitutional. Id. at 235.

In Graves's case, the sections in the warrants for listing the items to be seized were left blank. The items to be seized were listed in Attachment B to the affidavits accompanying the search warrants, but those lists were not incorporated into the warrants themselves. For that reason, the government concedes that "the search warrants are facially invalid." (Government's Second Supplemental Brief, at 3.) However, it argues that the search of the Isuzu was constitutional because of the automobile exception to the warrant requirement. Additionally, the government contends that the evidence resulting from the search of Neal's home should not be suppressed due to the good faith exception. The Court will address each search in turn.

1.     Search of the Isuzu and the Automobile Exception

As a general matter reasonable searches and seizures must be based upon probable cause and executed pursuant to a warrant. However, the automobile exception to the warrant requirement permits "warrantless searches of any part of a vehicle that may conceal evidence . . . where there is probable cause to believe that the vehicle contains evidence of a crime." United States v. Salmon, 944 F.2d 1106, 1123 (3d Cir. 1991) (citing United States v. Ross, 456 U.S. 798 (1982)). Probable cause exists when, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

> [P]robable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide the fruits of his crime. . . . A court is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.

United States v. Hodge, 246 F.3d 301, 305-06 (3d Cir. 2001) (internal citations and quotations omitted).

Probable cause to search the Isuzu existed in this case. The bank employee saw Neal suspiciously looking into the bank and then drive away in the Isuzu shortly before the robbery. The Izusu was registered to Graves, who the bank's assistant manager picked out of a photo line-up. Had defense counsel moved to suppress the evidence from the search of the Isuzu based on the lack of particularity in the warrant, such a motion would have failed. "[C]ounsel cannot be deemed ineffective for failing to raise a meritless claim." Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000). Thus, counsel was not ineffective for failing to move to suppress the evidence found in the Isuzu due to lack of particularity – the failure to list the items to be seized or to

incorporate a list of such items in the search warrants.

2.      <u>Search of Neal's Home and the Good Faith Exception</u>

The government argues that evidence from the search of Neal's home should not be suppressed because of the good faith exception. The government relies principally on <u>Herring v. United States</u>, 555 U.S. 135 (2009) and cases interpreting that decision. In <u>Herring</u>, the Supreme Court applied the good faith exception to a search conducted based on a police officer's reasonable reliance on erroneous information concerning an arrest warrant in a database. <u>Id.</u> at 136-137. However, <u>Herring</u> was decided in 2009, over a year after Graves's third trial. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." <u>Strickland</u>, 466 U.S. at 689. Accordingly, counsel's performance is "viewed as of the time of counsel's conduct." <u>Id.</u> at 690. Thus, when evaluating the performance prong of the <u>Strickland</u> test, the Court will not consider cases decided after Graves's conviction. Such developments in the law are properly analyzed under <u>Strickland</u>'s prejudice prong. <u>See</u> <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371-72 (1993).

Based on the law at the time of Graves's trial, the good faith exception does not apply. The <u>Leon</u> good faith exception provides that suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." <u>United States v. Williams</u>, 3 F.3d 69, 74 (3d Cir. 1993). "The test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate [judge's] authorization.'" <u>United States v. Loy</u>, 191 F.3d 360, 367 (3d Cir. 1999) (quoting <u>Leon</u>, 468 U.S. at 922 n.23 (1984)). "There are situations, however, where an officer's reliance on a warrant would not be reasonable and would not trigger the good

10

faith exception." United States v. Zimmerman, 277 F.3d 426, 436 (3d Cir. 2002). In Leon, the

Supreme Court identified four such situations:

1. Where the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit;

2. Where the magistrate abandoned his or her judicial role and failed to perform his or her neutral and detached function;

3. Where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

4. Where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

Id. at 437-38; see also Leon, 468 U.S. at 923. It is the last of these limitations on the application

of the good faith exception that is at issue in Graves's case. With respect to that limitation, "a

warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or

the things to be seized – that the executing officers cannot reasonably presume it to be valid."

Leon, 468 U.S. at 923.

The Supreme Court discussed the good faith exception and facially deficient warrants in

Groh in the context of a qualified immunity claim. 540 U.S. at 563-65. As mentioned above,

Groh involved a search premised on a warrant that did not particularize the items to be seized,

even though the warrant application did, in fact, identify such items. Id. at 554. The Court

concluded that the officer who prepared and executed the facially invalid warrant was not

entitled to qualified immunity and stated, "The same standard of objective reasonableness that

we appl[y] in the context of a suppression hearing in Leon defines the qualified immunity

accorded an officer." Id. at 565 n.8.

Like the warrant in Groh, the warrant for the search of Neal's home failed to specify any

item to be seized.  Nor did the warrant incorporate the list of items to be seized in Attachment B

to the affidavit accompanying the search warrant.  The section of the warrant for listing the items

to be seized was left blank.  The Court concludes that a reasonably well trained officer would

have known that the search was illegal.  The warrant was so facially deficient that the executing

officers could not reasonably have presumed it to be valid.  Accordingly, the good faith

exception does not apply to this case.  Had defense counsel moved to suppress the evidence

because the search warrants did not identify or incorporate by reference the items to be seized,

that motion would have been granted.

The Court next turns to the question whether there was a valid reason defense counsel did

not move to suppress on that ground.  "To overcome the Strickland presumption that, under the

circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner

must show either that: (1) the suggested strategy (even if sound) was not in fact motivating

counsel or, (2) that the actions could never be considered part of a sound strategy."  Thomas v.

Varner, 428 F.3d 491, 499 (3d Cir. 2005).  "Courts have routinely declared assistance ineffective

when the record reveals that counsel failed to make a crucial objection or to present a strong

defense solely because counsel was unfamiliar with clearly settled legal principles."  Id. at 500

(internal quotations omitted).

At the evidentiary hearing, one of Graves's trial lawyers stated that she did not see

anything inappropriate or unlawful in the warrant application with respect to the search warrant's

description of the items to be seized.  (Apr. 5, 2012 Hearing Tr. at 43-44.)  Thus, defense

counsel's failure to move to suppress on particularity grounds was not based on trial strategy.

"All lawyers that represent criminal defendants are expected to know the laws applicable

to their client's defense." See Osagiede v. United States, 543 F.3d 399, 409 (7th Cir. 2008). The Court concludes that counsel's failure to move to suppress based on the failure to list or incorporate a list of items to be seized in the search warrant fell below an objective standard of reasonableness. With respect to the search of Neal's home, the Court will therefore turn to Stickland's prejudice prong.

(b)     Prejudice

Generally, in assessing prejudice, the appropriate question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. However, "there are also situations in which it would be unjust to characterize the likelihood of a different outcome as legitimate 'prejudice.'" Terry Williams v. Taylor, 529 U.S. 362, 391-92 (2000). One such situation is the likelihood of a different outcome based on an old interpretation of the law that has since been overruled. Id. at 392; Lockhart v. Fretwell, 506 U.S. 364, 371-72 (1993).

In Fretwell, defendant Bobby Ray Fretwell was convicted in Arkansas of capital felony murder. 506 U.S. at 366. The jury sentenced Fretwell to death based in part on the aggravating factor that the murder was committed for pecuniary gain. Id. However, pecuniary gain was also an element of the underlying robbery. Id. at 367. Shortly before the trial, the Eighth Circuit held in Collins v. Lockhart, 754 F.2d 258 (8th Cir. 1985) that such "double counting" was unconstitutional. Fretwell, 506 U.S. at 367. Nevertheless, trial counsel did not object, and the Arkansas Supreme Court affirmed Fretwell's conviction and death sentence. Fretwell, 506 U.S. at 367.

Fretwell filed a federal habeas corpus petition challenging his sentence on ineffective

assistance of counsel grounds because his attorney did not raise an objection based on <u>Collins</u>.
<u>Id.</u>  However, after the petition was filed, the United States Supreme Court overruled <u>Collins</u> in <u>Lowenfield v. Phelps</u>, 484 U.S. 231 (1988).  <u>Fretwell</u>, 506 U.S. at 368.  In view of that decision, the Supreme Court in <u>Fretwell</u> concluded that Fretwell was not "prejudiced" by counsel's failure to object because he was not deprived of "any substantive or procedural right to which the law entitle[d] him" at the time his habeas petition was decided.  <u>Id.</u> at 372.

In Graves's case, the government argues that under <u>Herring v. United States</u>, 555 U.S. 135 (2009), the good faith exception would save the evidence from the search of Neal's home from suppression.  Thus, pursuant to <u>Fretwell</u>, if the government's assertion is correct, Graves would not be prejudiced by trial counsel's failure to move to suppress the evidence from Neal's home.

The Court must first address the question of whether the evidence would be suppressed under <u>Herring</u>.  If the evidence would be admissible under <u>Herring</u>, the current law, Graves's would not have suffered "legitimate prejudice."  <u>See</u> <u>Terry Williams</u>, 529 U.S. at 392.  If the evidence would still be suppressed, the Court applies the traditional <u>Strickland</u> prejudice test: whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Strickland</u>, 466 U.S. at 694.

1.    <u>Whether the Evidence Would Be Suppressed Under *Herring*</u>

In certain circumstances, the remedy for a Fourth Amendment violation is the suppression of the evidence obtained as a result of the unconstitutional search.  This principle of excluding evidence at trial is called the "exclusionary rule."  <u>Herring</u> involves the so-called "good faith" exception to the exclusionary rule, which was established in <u>United States v. Leon</u>,

468 U.S. 897 (1984). In Leon, the Supreme Court held that the exclusionary rule does not apply

where it would "deter objectively reasonable law enforcement activity." Id. at 919. Leon

identified one such situation: "evidence obtained in objectively reasonable reliance on a

subsequently invalidated search warrant." Id. at 922. This objectively reasonable reliance has

come to be known as "good faith." Herring, 555 U.S. at 142. However, the Supreme Court also

concluded that, in certain circumstances, officers could not take advantage of the good faith

exception. For example, "[a] warrant may be so facially deficient – i.e., in failing to particularize

the place to be searched or the things to be seized – that the executing officers cannot reasonably

presume it to be valid." Leon, 468 U.S. at 923.

The Supreme Court has since expanded the "Leon good faith exception." See Davis v.

United States, 131 S.Ct. 2419, 2423-24 (2011) (extending exception to cover search conducted in

reasonable reliance on binding appellate precedent that is subsequently overruled); Arizona v.

Evans, 514 U.S. 1, 14 (1995) (extending exception to cover arrest by officer reasonably relying

on erroneous judicial database of arrest warrants); Illinois v. Krull, 480 U.S. 340, 349-50 (1987)

(extending exception to cover search conducted in reasonable reliance on later-invalidated

statute); Massachusetts v. Shepard, 468 U.S. 981, 990 (1984) (extending exception to cases

where warrant invalid due to judge's clerical error).

Herring involves another extension of the good faith exception. In that case, defendant

Bennie Dean Herring drove to the Coffee County Sheriff's Department to retrieve something

from his impounded truck. Herring, 555 U.S. at 137. An investigator asked both the Coffee

County and neighboring Dale County warrant clerks to check for outstanding warrants. Id. The

Dale County clerk, after checking her computer database, reported that there was an active arrest

warrant out for Herring.  Id.  However, there was a mistake in the computer system.  Id.  That warrant had been recalled months earlier.  Id.  The clerk called back to warn the investigator about the mix up, but it was too late.  Id.  The investigator had already arrested Herring, searched him, and found contraband.  Id.

The Supreme Court ruled in Herring that the evidence from the search should not be suppressed.  Id. at 147-48.  It reasoned that "the benefits of deterrence must outweigh the costs," specifically, the cost of "letting guilty and possibly dangerous defendants go free."  Id. at 141.  "The exclusionary rule," the Supreme Court went on, "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  Id. at 144.  The Court concluded, "[W]hen police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not pay its way."  Id. at 147-48 (internal quotations omitted).

There has been significant disagreement regarding the interplay between Herring and limitations on the good faith exception identified in Leon.  The issue that has divided the courts is whether evidence obtained pursuant to a warrant that is so facially deficient that the executing officers cannot reasonably presume it to be valid may nevertheless be admissible under Herring if law enforcement's conduct is not deliberate, reckless, or grossly negligent.  As to this question, there is disagreement among the circuits;[4] disagreement within the Third Circuit;[5] and even a

---

[4] Compare United States v. Lazar, 604 F.3d 230 (6th Cir. 2009) with United States v. Rosa, 626 F.3d 56 (2d Cir. 2010).  Other circuits have relied on Herring but did not face the precise question presented in this case because they ultimately concluded that the warrant at issue was not so facially deficient that an officer could not reasonably rely on it.  See United States v. Hamilton, 591 F.3d 1017 (8th Cir. 2010); United States v. Allen, 625 F.3d 830 (5th Cir. 2010); United States v. Otero, 563 F.3d 1127 (10th Cir. 2009).

judge who disagreed with his own prior ruling.[6]  Some courts have concluded that such facially

invalid warrants always trigger the exclusionary rule because they are not protected by the good

faith exception.  Other courts have concluded that even when searches are conducted pursuant to

a warrant that is so facially deficient that an officer could not reasonably rely on it, the

exclusionary rule will not apply unless the court determines that law enforcement's conduct was

"deliberate, reckless, or grossly negligent."  See Herring, 555 U.S. at 144.

(i)      The Circuit Split

On one side of the circuit split is the Sixth Circuit.  That court has ruled, even after

Herring, that evidence should always be suppressed when obtained pursuant to a warrant that is

so facially deficient that the executing officers cannot reasonably presume it to be valid.  United

States v. Lazar, 604 F.3d at 237-38.  In Lazar, police searched a physician's office pursuant to a

warrant.  Id. at 233.  The warrant appeared to incorporate a list of patients whose files could be

seized.  However, there were numerous patient lists presented to the Sixth Circuit and the lower

court "made no finding as to which, if any, patient lists came before the issuing Magistrate

Judge."  Id. at 234-36.  The Sixth Circuit determined that the warrant was invalid with respect to

any patients whose names were not presented to the magistrate judge and that "the deficiency

---

[5] Compare Virgin Islands v. John, 654 F.3d 412 (3d Cir. 2011) with United States v. Wright, 2012 WL 3519004 (3d Cir. 2012).  The Third Circuit also addressed Herring in United States v. Tracey, 597 F.3d 140, 151 (3d Cir. 2010).  However, that court was not faced with the precise question raised in this case because it too ultimately concluded that the warrant at issue was not so facially deficient that an officer could not reasonably rely on it.

[6] United States v. Rosa, 634 F.3d 639, 639 (2d Cir. 2011) (Kaplan, J., dissenting from denial of rehearing en banc) ("Although I joined the panel opinion, the petition [for rehearing en banc] has persuaded me that the case should be reheard and, on rehearing, reversed.").

was so evident . . . that no officer could reasonably presume the warrants valid." Id. at 238.

More importantly, the court stated that the case did not "involve the sort of conduct present in

Herring." Id. at 237. Rather, "[l]ike Groh, it instead deal[t] with particularization of search

warrants and whether they are facially deficient." Id. Accordingly, the court concluded that

"Herring does not purport to alter that aspect of the exclusionary rule which applies to warrants

that are facially deficient warrants ab initio." Id. at 237-38. The Court ultimately remanded the

case to the district court "to determine which list – if any – came before the issuing Magistrate

Judge." Id. at 238.

The Second Circuit reached the opposite result, concluding that courts must make an

additional culpability determination before evidence obtained pursuant to a facially invalid

warrant can be suppressed. In United States v. Rosa, police searched defendant Efrain Rosa's

home. 626 F.3d 56, 58-59 (2d Cir. 2010). However, "[t]he warrant was defective in failing to

link the items to be searched and seized to the suspected criminal activity . . . and thereby lacked

meaningful parameters on an otherwise limitless search of Rosa's electronic media." Id. at 62.

Nevertheless, the court ruled that the evidence from the search should not be suppressed. The

court noted the statement in Leon that warrants may be so facially deficient that the good faith

exception does not apply. Id. at 65. However, the court concluded that "the [Supreme] Court

has made clear since Leon that . . . the application of the exclusionary rule requires the additional

determination that the officers' conduct was 'sufficiently deliberate that exclusion can

meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the

justice system.'" Id. at 66 (quoting Herring, 555 U.S. at 144). Applying that interpretation of

Herring, the Second Circuit concluded that because there was no evidence that the officers

"actually relied on the defective warrant as opposed to their knowledge of the investigation . . .

the requisite levels of deliberateness and culpability justifying suppression [were] lacking."  Id.

at 66.[7]

The Court next addresses the Third Circuit cases interpreting Herring.

(ii)     The Disagreement in the Third Circuit

There has also been disagreement within the Third Circuit regarding Herring's effect on

the limitations to the good faith exception outlined in Leon.

In Virgin Islands v. John, 654 F.3d 412 (3d Cir. 2011) the Third Circuit concluded that

evidence is always excluded when one of the limitations to the good faith exception outlined in

Leon applies.  John involved the search of defendant Tydel John's home for child pornography.

Id. at 414.  The affidavit accompanying the warrant that authorized the search was "wholly

lacking in probable cause because even a cursory reading of . . . the affidavit reveals that there is

not a single assertion at John was in any way associated with child pornography."  Id. at 419

(internal quotations and alterations omitted).  The Virgin Islands Supreme Court ruled that the

search violated the Fourth Amendment and that the good faith exception did not save the

evidence from suppression.  Id. at 415.  The Third Circuit granted the Virgin Islands's petition

for a writ of certiorari "limited to the question of whether the decision of the Supreme Court of

the Virgin Islands [was] inconsistent with Herring. . . ."  Id.

---

[7] As noted above, Judge Kaplan – who joined the decision in Rosa – changed his mind upon
reading the petition for rehearing en banc.  Rosa, 634 F.3d at 639.  He stated:  "The majority's
holding is in line with the broad language of Herring.  That is why I joined it.  On reflection,
however, I think that Groh . . . should have controlled the outcome and that the majority puts too
much weight on rhetoric in Herring that was not necessary to the result.  Under Groh . . . the
warrant here was so facially invalid that the evidence seized pursuant to it should have been
excluded."  Id. at 642.

The Third Circuit outlined the limitations on the good faith exception, including the one relevant to Graves's case (where warrants are facially invalid) and the one at issue in <u>John</u> itself: "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." <u>Id.</u> at 418. The court stated that "[t]hese limited exceptions are consistent with the approach taken in <u>Herring</u> because each of these circumstances involves conduct that is deliberate, reckless, or grossly negligent, and thus the benefits of deterring future misconduct outweigh the costs of excluding the evidence." <u>Id.</u> (internal quotations and alterations omitted).

Referencing the limitation on the good faith exception applicable to warrants that lack indicia of probable cause, the court stated, "Policing this requirement easily passes the cost-benefit analysis set forth in <u>Herring</u>. Reliance on a warrant affidavit that omits a fact critical to any reasonable belief in the existence of probable cause is the sort of thing we expect the exclusionary rule to deter. . . ." <u>Id.</u> at 420. The court further stated, "<u>Leon</u> and its progeny establish that an officer's conduct is sufficiently deliberate and culpable when she relies on a warrant that is devoid of probable cause. . . ." <u>Id.</u> at 420-21. The court concluded that the evidence was properly suppressed. <u>Id.</u> at 422.

However, in the non-precedential decision <u>United States v. Wright</u>, a different Third Circuit panel disagreed with the <u>John</u> court's characterization of <u>Herring</u>. According to that panel, while the good faith exception does not apply to facially invalid warrants, evidence still may not necessarily be suppressed. For the exclusionary rule to apply, police conduct must also be "deliberate, reckless, or grossly negligent." <u>See</u> <u>Herring</u>. 555 U.S. at 144.

In <u>Wright</u>, the area of the warrant application "face sheet" to list the items to be seized

contained the words, "SEE ATTACHED AFFIDAVIT OF PROBABLE CAUSE." 2012 WL

3519004, at *2 (3d Cir. 2012). While the affidavit of probable cause did state the items to be

seized, "it was removed from the warrants at the government's request, impounded, and sealed

before the warrants were executed." Id. Although the warrant was valid when presented to the

magistrate judge, it was later rendered invalid under Bartholomew v. Pennsylvania, 221 F.3d 425

(3d Cir. 2000) because the affidavit with the list items to be seized was not present at the time of

the search. Wright, 2012 WL 3519004, at *3-*5.

The district court in Wright ruled that the officers were not entitled to rely on the good

faith exception because their search was based on a facially invalid warrant. Id. That court

reasoned, "In Herring, the Supreme Court did not abandon or question its clear statement in Leon

that 'a warrant may be so facially deficient – i.e., in failing to particularize the place to be

searched or the things to be seized – that the executing officers cannot reasonably presume it to

be valid.' . . . The Third Circuit repeated this rule, presuming it to be valid even in light of

Herring." United States v. Wright, 730 F. Supp. 2d 358, 375 (E.D. Pa. 2010) (internal citations

omitted).

The Third Circuit disagreed with the district court in Wright. Specifically, the Wright

panel stated that the district court's "assumption that a facially invalid warrant automatically

triggered a per se application of the exclusionary rule" was "erroneous." 2012 WL 3519004, at

*6. That court went on to describe the district court's analysis as a "conflation of the similar-but-

separate good faith exception and exclusionary rule doctrines." Id. at *7. The court further

stated that the district court should not have relied on the statement in Third Circuit cases such as

John that the good faith exception does not apply "in cases in which 'the warrant is so facially

deficient that it fails to particularize the place to be searched or the things to be seized.'" Id. (quoting John, 654 F.3d at 418). Rather, in the Wright panel's view, "only police behavior that can be characterized as deliberate, reckless, or grossly negligent merits exclusion." Id. According to the panel, "although qualifying for the good faith exception may result in admitting evidence, not qualifying for it does not mean that the evidence will be suppressed." The court reversed the district court and remanded so that the district court could make further findings regarding the culpability of the officers. Id. at *8. On remand, the district court denied the motion to suppress. See United States v. Wright, 2013 WL 3090304, at *10 (E.D. Pa. June 20, 2013).

(iii)   <u>Analysis</u>

The government urges this Court to follow the Third Circuit's decision in <u>Wright</u> and hold an evidentiary hearing to determine the subjective mental state of the officer who prepared the warrant to search Neal's home. The government asserts that such a hearing will show that the deficiency in the warrant was not a result of deliberate, reckless, or grossly negligent conduct. Consequently, according to the government, the evidence from the search would not be suppressed under <u>Herring</u>.

The Court disagrees with the government's position that the subjective mental state of the officer is relevant. To the contrary, the Court concludes that the exclusionary rule applies in this case because the warrant was so facially deficient that the executing officers could not have reasonably presumed it to be valid.

This Court is faced with two competing Third Circuit interpretations of <u>Herring</u>. In <u>John</u>, the Third Circuit stated that the situations identified in <u>Leon</u> where the good faith exception does

not apply are "consistent with the approach taken in <u>Herring</u> because each of these circumstances involves conduct that is deliberate, reckless, or grossly negligent, and thus the benefits of deterring future misconduct outweigh the costs of excluding the evidence." 654 F.3d at 418. (internal quotations omitted). However, the panel in <u>Wright</u> described that discussion as dicta and stated that it was incorrect to assume that a "facially invalid warrant automatically triggered a per se application of the exclusionary rule." <u>Wright</u>, 2012 WL 3519004, at *6-*7. This Court follows the <u>John</u> interpretation.

The decision in <u>Wright</u> is non-precedential. Such opinions "are not binding precedent in this circuit." <u>Kolkevich v. Att'y Gen of U.S.</u>, 501 F.3d 323, 331 n.5 (3d Cir. 2007). In contrast, <u>John</u> is a binding decision in which the Third Circuit discussed <u>Herring</u> and clearly stated that the limitation on the good faith exception for facially invalid warrants is "consistent with the approach taken in <u>Herring</u>." <u>John</u>, 654 F.3d at 418.

The <u>Wright</u> panel dismissed the <u>John</u> court's discussion of <u>Herring</u> as dicta. This Court disagrees that <u>John</u> can be so easily disregarded. In <u>John</u>, the Third Circuit granted certiorari on the question of "whether the decision of the Supreme Court of the Virgin Islands is inconsistent with <u>Herring</u>. . . ." <u>Id.</u> at 415. Thus, it was squarely faced with the question of how <u>Herring</u> affected the pre-existing law on the good faith exception. As discussed above, the Supreme Court in <u>Leon</u> set forth four situations in which the good faith exception does not apply. <u>See</u> <u>Leon</u>, 468 U.S. at 923. The court in <u>John</u> examined <u>Herring</u>'s impact on one of those four limitations: "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." <u>John</u>, 654 F.3d at 418. The court did not analyze the subjective mental state of the officer who prepared the warrant. Rather,

it concluded that, in all cases, "an officer's conduct is sufficiently deliberate and culpable when she relies on a warrant that is as devoid of probable cause as [the warrant at issue in the case]." Id. at 420-21. The court ultimately ruled that the officer's "reliance on the warrant was entirely unreasonable [and that] her behavior was, at a minimum, grossly negligent." Id. at 421 (internal citations and quotations omitted).

That reasoning applies equally to the other limitations on the good faith exception outlined in Leon, including the one at issue in this case: where a warrant is so facially deficient that the executing officers could not reasonably have presumed it to be valid. In that situation as well, law enforcement's conduct is sufficiently deliberate and culpable to justify exclusion. Reliance on such a warrant similarly constitutes, at a minimum, "gross negligence."

The Wright panel also faulted the district court for its "conflation of the similar-but-separate good faith exception and exclusionary rule doctrines." 2012 WL 3519004, at *7. However, in John, the Third Circuit called the doctrine a single "Leon-Herring rule." 654 F.3d at 418. Additionally, the Supreme Court in United States v. Davis referred to Herring as a case that extended the good faith exception. 131 S. Ct. 2419, 2428 (2011). In summarizing prior good faith cases, the Supreme Court stated, "In Arizona v. Evans, [514 U.S. 1 (1995)], the Court applied the good-faith exception in a case where the police reasonably relied on erroneous information concerning an arrest warrant in a database maintained by judicial employees." Davis, 131 S. Ct. at 2428. It then described Herring as "extending Evans in a case where police employees erred. . . ." Id. (emphasis in original).

Moreover, this Court agrees with the Third Circuit in John and the district court in Wright that Herring did not alter the prior state of the law concerning the limitations on the good faith

exception outlined in <u>Leon.</u>  <u>Herring</u> itself is not entirely clear on what role the subjective mental

state of a law enforcement officer should play in determining whether the good faith exception

should apply.  At one point in the opinion, the Supreme Court states that "the exclusionary rule

serves to deter deliberate, reckless, or grossly negligent conduct."  555 U.S. at 150-51.

Similarly, the Court states at the end of its decision, "[W]e conclude that when police mistakes

are the result of negligence such as that described here, rather than systemic error or reckless

disregard of constitutional requirements, any marginal deterrence does not pay its way."  <u>Id.</u> at

147-48 (internal quotations omitted).

However, at another point, the Court in <u>Herring</u> steps back from this broad language,

stating, "The pertinent analysis of deterrence and culpability is objective, not an inquiry into the

subjective awareness of arresting officers.  We have already held that our good-faith inquiry is

confined to the objectively ascertainable question whether a reasonably well trained officer

would have known that the search was illegal in light of all of the circumstances."  <u>Id.</u> at 145

(internal citations omitted).  This statement supports the contention that the subjective mental

state of the officer is irrelevant.  At best, as Justice Ginsburg points out in her dissent in <u>Herring</u>,

"[i]t is not clear how the Court squares its focus on deliberate conduct with its recognition that

application of the exclusionary rule does not require inquiry into the mental state of the police."

<u>Id.</u> at 710 (Ginsburg, J. dissenting).

Given this all of these statements in <u>Herring</u>, this Court concludes that <u>Herring</u> did not

undermine that part of <u>Leon</u> in which the Court stated that the good faith exception is not

applicable where a warrant is "so facially deficient – i.e., in failing to particularize the place to be

searched or the things to be seized – that the executing officers cannot reasonably presume it to

be valid." See Leon, 468 U.S. at 923.

In sum, this Court concludes that where a warrant is so facially deficient that the executing officers could not reasonably have presumed it to be valid, as in this case, the good faith exception does not apply. Such conduct is at a minimum, grossly negligent, and the benefits of deterring future misconduct outweigh the cost of excluding the evidence. This Court previously concluded that under the law at the time of Graves's trial, the good faith exception would not have applied because of the facial deficiency in the warrant. Herring does not alter that conclusion. The evidence from the search of Neal's home would have been suppressed on particularity grounds under either the state of the law at the time of trial or the current state of the law. Thus, Fretwell does not apply, and the Court will address the traditional Strickland prejudice prong.

2.     Whether There is a Reasonable Probability that the Result of the Proceeding Would Have Been Different

To satisfy the traditional prejudice prong of the Strickland test, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. Id. "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." Cullen v. Pinholster, 131 S.Ct. 1388, 1403 (2011). "The effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989)

(quoting <u>Strickland</u>, 466 U.S. at 696).

The evidence that would have been suppressed are a pair of men's New Balance sneakers and receipts for purchases totaling just over $225. Graves's trial was a close case, resulting in two mistrials before a conviction. Nevertheless, when considering the totality of the circumstances, there is not a reasonable probability that, had the evidence from Neal's home not been available at trial, the outcome would have been different.

The suppressed evidence did not have a strong impact on the trial. Even without the receipts for approximately $225 worth of purchases found in Neal's home, the government still would have been able to present to the jury the receipts for approximately $1,650 worth of purchases found in the Isuzu. Moreover, the receipts were not even strong evidence of post-robbery spending because they only accounted for a fraction of the over $6,000 stolen from the bank.

The suppression of the New Balance sneakers similarly does not undermine confidence in the jury's verdict. FBI forensic examiner Michael Smith testified that he could not make a positive identification that the New Balance sneakers made the impression left on the bank teller's counter. Rather, he could only conclude that the impression was consistent with the New Balance sneakers – that it was possible they could have left the impression. Additionally, one witness testified that the man she saw rob the bank was wearing boots, not sneakers, which undermines the importance of the sneakers to Graves's conviction. (Nov. 6, 2007 Trial Tr. at 57-60.)

There was ample evidence of Graves's guilt. The core of the trial was Kimberly Buckley's identification. Buckley stated that she saw Graves's face before he put on his mask

only moments before the robbery.  Moreover, the government presented evidence that Graves's car was at the bank shortly before the robbery.  A woman seen suspiciously looking into the bank left the parking lot in that car.  Finally, Tara Detweiler saw through a gap between the robber's sunglasses and mask that he had light skin and freckles or moles on his cheeks – features consistent with Graves's.

The receipts and sneakers recovered from Neal's home played only a small part in the trial.  There is not a reasonable probability that, without that evidence, Graves would not have been found guilty.  Thus, Graves's ineffective assistance of counsel claim based on the failure to move to suppress the evidence from Neal's home based on lack of particularity in the warrant is denied.

  B.  Failing to Call Neal as a Witness

Graves also argues that counsel was ineffective for not calling Neal as a witness in the third trial.  The Court rejects that argument.

In evaluating counsel's performance, a reviewing court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Stickland, 466, U.S. at 689.  Moreover, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id.

In this case, counsel testified to the disadvantages of calling Neal as a witness:  She placed Graves in the area at the time of the robbery and her testimony was not particularly

credible.  According to her version of events, at Graves's behest she drove to the bank parking lot to purchase marijuana, but the seller did not immediately show up.  When she looked through the bank window she said she was not "casing" the bank, but rather looking for a clock to determine the time.

Trial counsel weighed the positives and negatives of Neal's testimony.  They made a strategic decision not to call Neal as a witness.  (See Apr. 5, 2012 Hearing Tr. at 35-36, 44-45.) This decision was not so unreasonable as to be constitutionally deficient.  Thus, Graves's ineffective assistance of counsel claim based on the failure to call Neal as a witness is denied.

## V.    CONCLUSION

For the foregoing reasons, Graves's Motion under 28 U.S.C. § 2255 is denied.  An appropriate order follows.